Filed 4/27/21  P. v. Pena CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ADAN PEÑA,<br><br>    Defendant and Appellant. | D077114<br><br>(Super. Ct. No. SCD278023) |


APPEAL from a judgment of the Superior Court of San Diego County, Margie G. Woods, Judge.  Affirmed as modified.

Heather L. Beugen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

In April 2019, defendant Adan Peña was convicted of car theft. As is sometimes the case, the superior court elected to impose an eight-year prison sentence but stay execution of that sentence and place Peña on probation. Peña later violated the terms of supervision and his probation was revoked.

In the meantime—that is, during the pendency of the revocation proceedings—the Legislature amended the Penal Code in a way that reduced to four years the maximum prison sentence that could be imposed on Peña. Because Peña did not appeal the original *imposition* of the eight-year prison term, the court in the revocation proceeding concluded it was without power to change the original sentence. But consistent with the principles recently enunciated by the Supreme Court in *People v. McKenzie* (2020) 9 Cal.5th 40 (*McKenzie*), we conclude Peña is entitled to the benefit of ameliorative changes to the criminal law that were enacted after his probation was originally imposed but before the finality of the revocation proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Peña had been on probation for less than a month following his conviction for stealing a car (Veh. Code, § 10851, subd. (a)) when he was arrested in May 2019 by Border Patrol agents near the town of Jacumba for driving two men, Juan Almaraz-Garcia and Rigoberto Garcia-Garcia, who admitted entering the United States without permission. According to their accounts, the two men (both of whom are Mexican citizens) climbed the border fence that same day and were directed by phone to Peña's car for transport.

Because Peña's probation terms included a general provision that he would remain law abiding, his probation officer became concerned after his arrest and alerted the court of his potential violation. In the subsequent probation revocation hearing, which took place in July 2019, the court

2

admitted some hearsay statements from Almarez-Garcia and Garcia-Garcia as relayed by Border Patrol agents. Neither of the men were available to testify since they were both deported within weeks of their arrival—well before the revocation hearing, which took place more than two months after Peña's arrest. Taking the hearsay statements and other factors into consideration, the court found that Peña violated the terms of his probation and revoked it.

When Peña was originally granted probation, the court elected to impose an eight-year prison term but suspend execution of that sentence— what is known as an "ESS" procedure.[1] Four of those years were due to one-year enhancements for prison priors added under former Penal Code section

---

[1] "When the trial court in a criminal case decides at time of sentencing to grant the defendant probation, the court may either suspend imposition of sentence or actually impose sentence but suspend its execution." (*People v. Howard* (1997) 16 Cal.4th 1081, 1084.) Of these two sentencing options, the former is known as "ISS" while the latter is termed "ESS." Conceptually, the difference between the two is merely one of timing—whether the court exercises its sentencing discretion when it grants probation (ESS) or reserves that decision for a later time if the probationer violates the terms of his or her release (ISS). The practical effect is that probationers with ISS have not yet been sentenced and are subject only to their probation terms. If they violate those terms, the court can *then* determine an appropriate sentence. Conversely, probationers with ESS have already been sentenced upon release and are subject to both the terms of their probation and the sentence that awaits them if they fail to comply. In such a case, the court is not permitted to exercise its discretion twice by reconsidering the sentence should the probationer fail to uphold his or her probation responsibilities. Rather, at that point, "[t]he revocation of the suspension of execution of the judgment brings the former judgment into full force and effect." (*Stephens v. Toomey* (1959) 51 Cal.2d 864, 874; accord *Howard*, at pp. 1086–1095 and *People v. Chavez* (2018) 4 Cal.5th 771, 781–782 (*Chavez*).)

3

667.5, subdivision (b).[2]  In October 2019, the Legislature enacted and the Governor signed Senate Bill No. 136 (2019–2020 Reg. Sess.) (Senate Bill 136), which limited the prison priors that qualify as enhancements under section 667.5, subdivision (b) to sexually violent offenses.  (Stats. 2019, ch. 590, § 1; *People v. Lopez* (2019) 42 Cal.App.5th 337, 340–341.)  None of Peña's prison priors would have permitted an enhancement under the new law, which became effective on January 1, 2020.

At his sentencing following revocation in December 2019, Peña asked the judge to strike the prison priors due to the impending change in the Penal Code.  But the court was ultimately convinced it did not have the power to do so, reasoning it was obligated to execute the already-imposed sentence without any changes.  In the court's view, Peña could not benefit from the new law because he did not appeal from his April grant of probation, rendering his case final well before the December hearing.

## DISCUSSION

Peña now raises the same issue on appeal, asserting he was entitled to benefit from the ameliorative changes to section 667.5 under the *Estrada* rule of retroactivity, and that his case is not yet final for those purposes.  (*In re Estrada* (1965) 63 Cal.2d 740, 745 (*Estrada*).)  To that end, he points out he had no reason to appeal his April probation order since he pleaded guilty and submitted to its terms.  It was not until the court *revoked* his probation in December that he had any cause to ask for review, and at that point Senate Bill 136 was poised to go into effect the next month.  The Attorney General opposes Peña's position, arguing that because he did not appeal from the April order, his case was final for *Estrada* purposes sixty days later—well

---

[2]    Further statutory references are to the Penal Code unless otherwise designated.

4

before his probation revocation and subsequent imposition of sentence in December.

In *McKenzie, supra,* 9 Cal.5th 40, the Supreme Court recently clarified the principles that govern when a judgment becomes final for *Estrada* purposes in terms that cast serious doubt on the People's argument. *McKenzie* concluded that a former probationer who did not appeal from his initial probation order was nonetheless eligible under the *Estrada* rule to benefit from changes in the law that became effective during his appeal from the later revocation decision because his case was not yet final before his probation terminated. We reach a similar conclusion here notwithstanding that *McKenzie* involved an ISS procedure whereas Peña's case involves an ESS situation.[3] Pending further guidance from the Supreme Court, we conclude the enhancements must be stricken from Peña's sentence.

Peña also claims the trial court erred in admitting the hearsay statements of Almaraz-Garcia and Garcia-Garcia at his probation revocation hearing. On this matter we disagree with Peña, finding enough in the balance of case-specific factors to justify the trial court's decision.

A.  *Peña's Case did not Become Final for* Estrada *Purposes After the Time to Appeal from his Probation Order Lapsed; for Those Purposes, his Case was Ongoing Throughout his Probation Period and its Revocation*

*Estrada, supra,* 63 Cal.2d 740 established that when the Legislature amends the Penal Code to reduce its punitive sting, it generally intends the change to reach all criminal defendants to whom it can constitutionally apply (absent some contrary expression). (*Id*. at p. 745.) That includes all

---

[3]  The propriety of relying on *McKenzie* in an ESS case is currently pending review. (See *People v. Martinez* (2020) 54 Cal.App.5th 885, review granted Nov. 10, 2020, S264848 (*Martinez*); *People v. Esquivel* (Mar. 26, 2020, B294024) [nonpub. opn.], review granted Aug. 12, 2020, S262551.)

defendants for whom a judgment of conviction is not yet final when the change comes into effect. (*Id*. at pp. 744–745.) As such, the "key date is the date of final judgment" for assessing whether a defendant's case is subject to the old statute or its gentler successor. (*Id*. at p. 744.) In accordance with this well-established principle, this court has concluded that "Senate Bill No. 136's amendment to section 667.5, subdivision (b) applies retroactively to all cases not yet final as of its January 1, 2020[] effective date." (*People v. Jennings* (2019) 42 Cal.App.5th 664, 682.)

But the term "final" creates some confusion, not least because it appears both definitive and singular when in fact it is not. Different dates of repose in a case can constitute distinct "final judgments" depending on the nature of the decision issued by the court and the purpose of subsequent litigation. For example, under section 1237, an order granting probation serves as a final judgment of conviction from which a defendant can appeal. It is the final judgment of conviction *for appellate purposes*. But that does not mean an order granting probation is a final judgment of conviction for *all* purposes in a criminal case.

The Attorney General assumes as much in this case, pointing to Peña's failure to appeal from the April order granting his probation and arguing that after the 60-day window in which he could have appealed closed, his judgment of conviction became final. (Cal. Rules of Court, rule 8.104(a).) But the question prompted by this case is not when Peña's judgment of conviction became final regarding his window to appeal his probation order, but rather when his case becomes final for purposes of applying *Estrada*'s rule of retroactivity.

Our resolution of that question is heavily guided by the Supreme Court's recent opinion in *McKenzie, supra,* 9 Cal.5th 40, which bears

6

significant similarities to our case. *McKenzie* involved a defendant who pleaded guilty to drug offenses and admitted prior drug convictions that added enhancements to his sentence under Health and Safety Code, former section 11370.2. (*McKenzie,* at p. 43.) He was granted probation and did not appeal from that order. He only appealed when his probation was later revoked, beginning that process about a month before the effective date of Senate Bill No. 180 (2017–2018 Reg. Sess.)—a bill that changed Health and Safety Code section 11370.2 such that McKenzie's prior drug convictions would no longer have constituted enhancements. (*McKenzie,* at p. 43.)

McKenzie petitioned for his enhancements to be stricken from his sentence given the ameliorative change to the Health and Safety Code. And when the Supreme Court weighed in, it explicitly rejected an argument made by the Attorney General that parallels the People's position in our case— namely, that *McKenzie* should have appealed from his grant of probation and was not entitled to the benefits of Senate Bill No. 180 because his judgment of conviction (conceptualized as the order granting probation) became final years before Senate Bill No. 180 went into effect. (*McKenzie, supra,* 9 Cal.5th at p. 46.) In explaining why the People were mistaken, the Supreme Court clarified that an order granting probation "has only 'limited finality' and ' "does not have the effect of a judgment" ' " for purposes other than the appeal right contemplated in section 1237. (*McKenzie,* at p. 47; quoting *Chavez, supra,* 4 Cal.5th 771, 786.) Rather, the " 'criminal action'—and thus the trial court's jurisdiction to impose a final judgment—'continues into and throughout the period of probation' and expires only 'when th[e] [probation] period ends.' " (*McKenzie,* at p. 47.)

In attempting to distinguish *McKenzie*, the Attorney General makes much of the ISS/ESS distinction. But we are not persuaded that the use of

7

an ISS in *McKenzie* creates a significant difference for purposes of determining *Estrada* retroactivity. Indeed, *McKenzie's* critique of the "legal principle associated with [the People's] argument" cannot be so easily sidestepped. (*McKenzie, supra,* 9 Cal.5th at p. 50.) As the court explained, the "defendant *could not* have raised this issue during a direct appeal from the probation order" because the appeal was "based on an event—the amendment of [Health and Safety Code] section 11370.2—that occurred long after the court ordered probation *and* the time for direct appeal lapsed." (*McKenzie*, at p. 50.) As such, the "defendant's failure to file [] a direct appeal [from his probation order] does not preclude him from taking advantage of ameliorative amendments that took effect while he was appealing from the subsequent revocation of his probation and imposition of sentence." (*Ibid*.) According to this broad ranging analysis, we see no reason to distinguish this case from *McKenzie* simply because the type of sentence Peña received prevented the trial court from revisiting its terms when his probation was revoked.

Our colleagues in the Second Appellate District, Division Seven came to a similar conclusion in *Martinez, supra,* 54 Cal.App.5th 885 in holding that *McKenzie*'s reasoning applied to a similarly situated defendant whose mandatory supervision was revoked. In *Martinez*, as in this case, the court that originally granted probation/mandatory supervision elected to utilize an ESS procedure. The Court of Appeal nonetheless applied *McKenzie*'s reasoning in concluding that the defendant was entitled to take advantage of the recent statutory change. It specifically found that the choice of an ISS or ESS approach to granting supervised release (in that case, mandatory supervision) made no difference in the *Estrada* analysis. (*Martinez,* at p. 893, citing *Chavez, supra*, 4 Cal.5th 771, 781 ["[N]either forms of probation—

8

suspension of the imposition of sentence or suspension of the execution of sentence—results in a final judgment."].)[4]  Consequently, the four enhancements for Peña's prison priors must be stricken from his sentence. We need not remand for resentencing in this case since Peña already received the maximum amount of time for which he was eligible.  (*People v. Gastelum* (2020) 45 Cal.App.5th 757, 772–773 ["But where, as here, an enhancement is erroneously imposed and the trial court has already imposed the maximum possible sentence, a remand for resentencing is unnecessary."].)

B.    *The Court did not Err in Admitting Hearsay Statements at the Probation Revocation Hearing*

As noted above, Border Patrol agents who arrested Peña testified as to statements they obtained from Almaraz-Garcia and Garcia-Garcia.  In broad terms, the agents relayed that (1) both men were Mexican citizens without a legal justification to enter the United States, (2) they paid someone to help them cross the border, (3) they crossed by climbing the border fence on May 8 (the day of their arrest), and (4) they were guided by phone to a car that would pick them up, which is how they ended up riding with Peña.  Apart from these hearsay statements, the agents also testified they observed Peña driving in the relatively remote border town of Jacumba and that he sped by and flashed his lights, which are driving tactics sometimes employed by smugglers in that area.

---

4    The People also rely on *People v. Scott* (2014) 58 Cal.4th 1415, which considered when defendants' *sentencing* occurred for purposes of determining whether they came under the Realignment Act, which applied statutorily "to any person sentenced on or after October 1, 2011."  (Pen. Code, § 1170, subd. (h)(7).)  Because construing the meaning of "sentenced" in that context is an entirely different inquiry than when a case becomes final for purposes of *Estrada* retroactivity, *Scott* does not assist in the analysis.  (See *Scott,* at pp. 1421–1426.)

The defense objected to all the hearsay statements, and the prosecution offered several justifications, arguing the statements were reliable because they were made by Almaraz-Garcia and Garcia-Garcia against their own interests (Evid. Code, § 1230) and also that the men were unavailable to testify (Evid. Code, § 240). The court ultimately found there was good cause to admit the statements, noting the two deportations were not the responsibility of the probation department but were rather controlled by the federal government. When it decided to revoke Peña's probation, the court further highlighted that it was not relying exclusively on the hearsay statements, but also the plentiful circumstantial evidence; Peña was driving quickly through a remote area and flashed his lights, conduct that supported the "reasonable inference[] that he knew what he was doing" by "using a system that's used to alert or provide information [for] assisting an individual entering into the United States . . . in an unlawful way."

Peña now argues that the admission of Almaraz-Garcia and Garcia-Garcia's statements at the hearing violated his due process rights, and that the court erred in finding good cause to admit the statements. In making these arguments, Peña puts significant weight on the fact that the probation department did not try to produce either man or secure a statement from one of them prior to his deportation. But the relevant analysis is whether good cause generally existed to excuse the in-person testimony of these witnesses. This is a case-specific consideration. Due to the untenable nature of bringing either man to the hearing after deportation and the corroborating evidence submitted, we conclude the hearsay statements were properly admitted. (See *People v. Arreola* (1994) 7 Cal.4th 1144, 1160 (*Arreola*) [court does not err in admitting hearsay at a probation revocation hearing so long as good cause

and consideration of "other circumstances relevant to the issue" justify the decision].)

Relaxed evidentiary standards govern at probation revocation hearings. (1 Witkin, Cal. Evidence (5th ed. 2020) Introduction, § 29.)  Although the confrontation clause does not apply, general due process guarantees remain in place. (*People v. Stanphill* (2009) 170 Cal.App.4th 61, 78.)  When the prosecution seeks to admit testimonial hearsay evidence at a probation revocation hearing, it may be admitted upon a showing of good cause as to the witness' absence—a determination that is made on a case by case basis. (*Arreola, supra,* 7 Cal.4th at pp. 1159–1160; *People v. Shepherd* (2007) 151 Cal.App.4th 1193, 1202 [*Arreola*'s good cause standard governs testimonial hearsay].)  As relevant here, good cause exists "(1) when the declarant is 'unavailable' under the traditional hearsay standard (see Evid. Code, § 240) [and] (2) when the declarant, although not legally unavailable, can be brought to the hearing only through great difficulty or expense."  (*Arreola,* at p. 1160; *Shepherd,* at p. 1202.)

In this case, we agree with the People that the declarants could only have been brought to the hearing through great difficulty and expense.  They were both deported within two weeks of their arrival in the United States, after which neither the Border Patrol agents nor the probation department knew of their whereabouts.  Insofar as Peña suggests the People were responsible for or otherwise in control of the deportation process, we agree with the trial court's observation that these are "two different governments."

And while it might well have been preferable, as Peña suggests, for the People to have requested a conditional examination prior to the deportations (§§ 1335–1345; see generally *People v. Foy* (2016) 245 Cal.App.4th 328, 341–342), we must consider the hearsay statements "together with other

11

circumstances" in this case, such as evidence corroborating the statements. (*Arreola, supra,* 7 Cal.4th at p. 1160.) Here, in addition to Peña's driving behavior and the area where he was arrested, we also have the fact of Almaraz-Garcia and Garcia-Garcia's quick deportations—all non-hearsay facts that tend to support their accounts of how they entered the country and what they were doing in Peña's car. Given all of this, we find the trial court properly balanced the defendant's confrontation rights against the relevant state interests in admitting the statements. (*Ibid*.)

## DISPOSITION

The judgment is modified to strike the four one-year prior prison term enhancements imposed under former section 667.5, subdivision (b). The clerk is directed to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


DATO, J.

WE CONCUR:


AARON, Acting P. J.


IRION, J.